828 A.2d 306

SOJOURNER A., ON HER OWN BEHALF AND AS GUARDIAN AD LITEM FOR HER INFANT Y.A.; ANGELA B., ON HER OWN BEHALF AND AS GUARDIAN AD LITEM FOR HER INFANT W.B., PLAINTIFFS–APPELLANTS, AND ROSA C., ON HER OWN BEHALF AND AS GUARDIAN AD LITEM FOR HER INFANT Y.C.; AND CRYSTAL D., ON HER OWN BEHALF AND AS GUARDIAN AD LITEM FOR HER INFANT S.D., ON BE-HALF OF THEMSELVES AND ALL OTHERS SIMILARLY SIT-UATED, PLAINTIFFS, v. THE NEW JERSEY DEPARTMENT OF HUMAN SERVICES AND WILLIAM WALDMAN, COMMIS-SIONER OF THE NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANTS–RESPONDENTS.

Argued January 22, 2003—Decided August 4, 2003.

*Lenora M. Lapidus,* argued the cause for appellants (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Ms. Lapidus, Lawrence S. Lustberg, Edward L. Barocus, Jennifer Ching, Spenta Cama* and *Sherry D. Leiwant,* a member of the New York bar, on the briefs).

*Dennis J. Conklin,* Senior Deputy Attorney General, argued the cause for respondents (*David Samson,* Attorney General of New Jersey, attorney; *Michael J. Haas,* Assistant Attorney General, of counsel).

*Grayson Barber,* submitted a brief on behalf of the *amici curiae,* The Center for Economic and Social Rights, The International Women's Human Rights Law Clinic and The Center for Constitutional Rights.

The opinion of the Court was delivered by

PORITZ, C.J.

In this appeal, plaintiffs challenge the constitutionality of a provision in the Work First New Jersey Act (WFNJ) that "caps" the amount of cash assistance for families at the level set when the family enters into the State welfare system. *N.J.S.A.* 44:10–61(a).[1] Although families in the assistance program are eligible to receive additional Medicaid and food stamp benefits on the birth of another child, the statute prohibits an increase in cash assistance

---

[1] Plaintiffs also challenge a predecessor provision, formerly found at *N.J.S.A.* 44:10–3.5 (repealed by *L.* 1997, *c.* 38, § 17, eff. March 24, 1997). Section 3.5 was part of the Family Development Act (FDA), *N.J.S.A.* 44:10–3.3 to –3.8, *N.J.S.A.* 44:10–19 to –33, which became effective July 1, 1992. That provision had "eliminat[ed] the increment in benefits under the program for which [the] family would otherwise be eligible as a result of the birth of a child during the period in which the family is eligible for … benefits …" and was repealed by

benefits for any child born more than ten months after the family initially applies for and obtains such benefits. *N.J.S.A.* 44:10–61(a), (b), and (e). Plaintiffs claim that the "family cap" violates the right to privacy and equal protection guarantees of the New Jersey Constitution. More specifically, plaintiffs allege that Section 61(a) impinges on a welfare recipient's right to bear a child and, if she chooses to have that child, denies her and her unsupported child equal treatment under the law.

## I

A brief description of the two families before the Court provides context for our review of the constitutional claims raised herein.

In 1987, shortly after giving birth to her first child, plaintiff Angela B. began receiving family Medicaid benefits in addition to a monthly allowance in the form of food stamps and cash assistance. Subsequently, in 1988, 1989, and 1995 Angela B. gave birth to three more children. She received an increase in combined welfare benefits for the two children born in 1988 and 1989, but due to the enactment of New Jersey's first family cap provision in the interim, was unable to obtain additional cash assistance when her fourth child was born.

In 1994, also after bearing her first child, plaintiff Sojourner A. began receiving Medicaid family coverage as well as monthly assistance in food stamps and cash payments. When Sojourner A. became pregnant with her second child in 1996, however, the State notified her that she was not eligible for an increase in cash assistance as her child would be born more than ten months after she had started receiving welfare benefits. According to Sojourner A., she again became pregnant in 1997 and 1998, but terminated those pregnancies because of financial difficulties and because "she was not ready … for more children." By 1998, Sojourner A. was working five days a week and was therefore ineligible for cash assistance under WFNJ, although her family remained entitled to Medicaid and an increase in food stamps.

the enactment of WFNJ in 1997. *See infra* at 177 *N.J.* at 326–28, 828 *A.*2d at 310–12.

Both Angela B. and Sojourner A. have stated in depositions that the lack of additional cash assistance has imposed an extreme financial hardship on their families and left them without adequate food, shelter and other necessities. At the time of filing, Sojourner A. was receiving $322 in cash assistance, $163 in food stamps, and Medicaid benefits for her two children. Angela B. was receiving $424 in cash assistance, $396 in food stamps, and Medicaid benefits for the three children then residing with her.

## II

On September 5, 1997, plaintiffs filed a class action lawsuit against the New Jersey Department of Human Services and its Commissioner (collectively Department or DHS), claiming that *N.J.S.A.* 44:10–61(a) and *N.J.A.C.* 10:90–2.18 [2] violate New Jersey's Constitution. The gravamen of plaintiffs' complaint is that the family cap provision has been designed impermissibly to coerce the procreative and child-bearing decisions of plaintiffs and other women similarly situated by penalizing them for "exercis[ing] their fundamental right to bear children." Plaintiffs further contend that the "family cap" violates the equal protection rights of certain classes of poor children "based on their parents' reproductive choices and the timing of [their] birth."

Plaintiffs sought preliminary injunctive and declaratory relief, which relief was denied on October 28, 1997. On July 17, 2000, however, the trial court granted class certification to:

all women who have conceived or will conceive a child while they or someone in their family received welfare benefits (or within a year of such receipts) under the

---

[2] *N.J.A.C.* 10:90–2.18 was promulgated to effectuate the family cap statute. Section 2.18 reads, in pertinent part:

(a) Adult ... recipient parents shall not be entitled to receive incrementally increased WFNJ cash benefits solely because of the birth of an additional child(ren). Although the family does not receive additional cash assistance, a child(ren) subject to this family cap provision is or are considered a member of the assistance unit for all purposes including, but not limited to, the existing cash assistance benefit, child support, medical assistance and food stamp benefits provided to the assistance unit.

former AFDC program or under the Work First program any time after October 1, 1992, and all children born to such women after August 1, 1993 who have been or will be subject to *N.J.S.A.* 44:10–61 and *N.J.A.C.* 10:90–2.18 or their predecessor statute and regulations, *N.J.S.A.* 44:10–3.5 and *N.J.A.C.* 10:81–3.8 and 10.81–1.11.

Subsequently, plaintiffs and the DHS filed a motion and cross-motion for summary judgment.

On December 18, 2000, the court entered an order granting the Department's cross-motion and dismissing plaintiffs' complaint with prejudice. In an oral opinion upholding the family cap under the New Jersey Constitution, the court applied the balancing test established by this Court in *Greenberg v. Kimmelman,* 99 *N.J.* 552, 494 *A.*2d 294 (1985), and *Right to Choose v. Byrne,* 91 *N.J.* 287, 450 *A.*2d 925 (1982). In respect of plaintiffs' right to privacy claim, the court stated that the right "may be restricted only when necessary to promote a compelling governmental interest." Distinguishing our decision in *Planned Parenthood of Central New Jersey v. Farmer,* 165 *N.J.* 609, 762 *A.*2d 620 (2000), wherein the data indicated that a significant burden was created when a minor's right to obtain an abortion was conditioned on parental notification, the court found that in this case the plaintiffs had failed to submit any evidence that the family cap materially affected a woman's right to make procreative choices. The court concluded:

[T]he State has demonstrated a legitimate and a substantial relationship between the statutory classification and the ends asserted. The interest here of the Legislature, [which] represents all of us, in promoting self-sufficient citizens, diminishing the dependency upon welfare and creating [parity] between welfare recipients and working people ... greatly outweighs an[y] slight imposition or mere burden on ... the plaintiffs' right to privacy.

The Appellate Division affirmed the trial court in a published opinion issued on April 2, 2002. Judge Winkelstein, writing for the panel, first observed that the Third Circuit Court of Appeals previously had affirmed a federal district court determination that the family cap [3] does "not violate the procreative privacy and equal

---

[3] The federal courts had before them a challenge to a discretionary waiver granted to the State of New Jersey by the United States Secretary of Health and

protection guarantees of the United States Constitution." *Sojourner A. v. New Jersey Dep't of Human Servs.*, 350 *N.J.Super.* 152, 163, 794 *A.*2d 822 (2002). *See C.K. v. N.J. Dep't of Health & Human Servs.*, 92 *F.*3d 171 (3d Cir.1996) (hereinafter *C.K. II*), *affirming, sub nom., C.K. v. Shalala*, 883 *F.Supp.* 991 (D.N.J. 1995) (hereinafter *C.K. I*). Nonetheless, because "'there may be circumstances in which the [New Jersey] Constitution provides greater protections'", *id.* at 166, 794 *A.*2d 822 (quoting *Barone v. Dep't of Human Servs.*, 107 *N.J.* 355, 368, 526 *A.*2d 1055 (1987)), than does the Federal Constitution, and because state restrictions on a woman's right to privacy and equal protection guarantees under our Constitution have been read expansively by our courts, the panel deemed those federal cases "not dispositive," *id.* at 163, 794 *A.*2d 822.

As had the trial court, the Appellate Division applied the balancing test set forth in *Right to Choose, supra,* and *Greenberg, supra,* acknowledged the fundamental nature of a woman's right to make procreative decisions under Article I, paragraph 1 of the New Jersey Constitution, and found that the family cap "at best, indirect[ly] and insignificant[ly]" intrudes on that right. *Id.* at 169, 794 *A.*2d 822. The panel concluded that the cap "does not present a direct obstacle to bearing children. It merely introduces one of many factors that a woman considers when deciding whether to become pregnant and carry the child to term[,] a choice that remains hers and hers alone." *Id.* at 171, 794 *A.*2d 822. Similarly, the panel found that the cap does not

> completely deprive either the family unit of the benefits it is already receiving, or eliminate all benefits to the newborn child. Although the welfare recipient will not receive an additional cash stipend for the child, she continues to receive benefits designed to assist her to obtain and retain employment, and significantly, Medicaid coverage and food stamps are provided for the additional child.

---

Human Services. That waiver granted the State relief from a provision of the Aid to Families with Dependent Children (AFDC) program requiring the states, *inter alia,* to provide a "standard AFDC grant increase ... for any child conceived by and born to an AFDC recipient." See discussion of federal welfare statutory overlay, *infra* at 177 *N.J.* at 326–28, 828 *A.*2d at 311.

*[Ibid.]*

Agreeing with the trial court that the purposes of the statute—reducing the welfare rolls and putting welfare families on the same footing as working families—are " 'laudable state objectives,' " the Appellate Division held that the family cap provision bears a substantial relationship to those legitimate and reasonable goals. *Id.* at 172, 794 *A.*2d 822 (quoting *Sanchez v. Dep't of Human Servs.*, 314 *N.J.Super.* 11, 17, 713 *A.*2d 1056 (App.Div. 1998)).

## III

### A

New Jersey has, since 1959, engaged in a cooperative effort with the federal government to provide aid to families in need of assistance. 42 *U.S.C.A.* § 601 *et seq.; see In re Petitions for Rulemaking N.J.A.C. 10:82–1.2 and 10:85–4.1*, 223 *N.J.Super.* 453, 456–58, 538 *A.*2d 1302 (App.Div.1988) (outlining history of State's participation in federal welfare programs), *aff'd*, 117 *N.J.* 311, 566 *A.*2d 1154 (1989). In a shift in approach related to that effort, the State Legislature enacted the FDA in 1992 to "offer[ ] intensified and coordinated services that . . . address the educational, vocational and other needs of the public assistance recipient's family. . . ." *N.J.S.A.* 44:10–20. That legislation included a provision that denied an incremental increase in benefits for children who were born when the family was eligible for AFDC benefits. *N.J.S.A.* 44:10–3.5 (repealed by *L.* 1997, *c.* 38, § 17). Implementation of Section 3.5 required a waiver from the United States Department of Health and Human Services that was obtained by DHS on July 20, 1992.

In 1996, Congress replaced AFDC with the Temporary Assistance to Needy Families (TANF) block grant program, 42 *U.S.C.A.* §§ 601–608. Under TANF, Congress provided the states with the flexibility to implement welfare reform in their jurisdictions, subject to a mandatory national welfare-to-work feature similarly designed to motivate welfare recipients to be-

come self-sufficient. *See, e.g.,* 42 *U.S.C.A.* § 607(a) (requiring percentage of recipients to work) and § 608(a)(7) (imposing time limits on cash assistance). In March of 1997, the New Jersey Legislature responded to the federal initiative by replacing the FDA with WFNJ, *N.J.S.A.* 44:10–55 to –70.

Under WFNJ, the level of cash benefits is determined pursuant to a schedule administered by the DHS. That schedule, with certain important limitations, provides incremental increases based on the size and need of the family. *N.J.A.C.* 10:69–10.2(a) and 90–3.3. One such limitation is the family cap found at *N.J.S.A.* 44:10–61(a), which states:

> The level of cash assistance benefits payable to an assistance unit with dependent children shall not increase as a result of the birth of a child during the period in which the assistance unit is eligible for benefits. . . .

The Act defines an "Assistance unit" as

> a single person without dependent children; . . . dependent children only; or a person or couple with one or more dependent children who are legally or blood-related, or who is their legal guardian, and who live together as a household unit.
> [*N.J.S.A.* 44:10–57.]

As noted earlier, the family cap does not apply "to an individual . . . who gives birth to a child fewer than 10 months after applying for and receiving cash assistance benefits." *N.J.S.A.* 44:10–61(e). The family cap also does not apply when the new child is the product of rape or incest. *N.J.S.A.* 44:10–61(f).

■ Like its predecessor New Jersey statute, and consonant with the TANF approach, the primary purpose of WFNJ is to encourage employment, self-sufficiency and family stability. *See generally N.J.S.A.* 44:10–56. Toward that end, WFNJ contains mechanisms designed to promote independence and decrease long-term reliance on welfare payments. One such mechanism reallocates the savings achieved by application of the family cap to a variety of programs aimed at developing adult welfare recipients' educational and vocational skills to enable them to get and keep stable employment.

Prior to receiving benefits, eligible welfare recipients are assessed as to their educational level, prior work experience and

other indicators of their "potential ... readiness for work." *N.J.S.A.* 44:10–62f. After the assessment is completed, "individual responsibility plan[s]" are developed to set specific goals in respect of employment, education obligations, medical care and schooling for the recipient's dependent children. *Ibid.* Once recipients agree to follow the plan, they must "continuously and actively seek employment" or accept placement in an approved "work activity" to continue in the program. *N.J.S.A.* 44:10–62a. Recipients are not on their own in this endeavor; WFNJ provides or subsidizes a panoply of such activities, including actual "employment; on-the-job training; job search and job readiness assistance; vocational educational training; job skills training related directly to employment; community work experience; alternative work experience; supportive work; community service programs ... [and] education that is necessary for employment...." *N.J.S.A.* 44:10–57. The statute encourages education by reducing the hourly work requirements for adult recipients who are "full time post-secondary student[s]," *N.J.S.A.* 44:10–62b, and permitting young parents under the age of nineteen to fulfill the "work activity" requirement by completing high school or a high school equivalency program, *N.J.S.A.* 44:10–57.

WFNJ also aims to remove barriers so that persons receiving welfare can maintain employment or stay in school. Under *N.J.S.A.* 44:10–38, recipients receive "supportive services" such as child care, transportation to and from work, and stipends for necessary "work-related expenses, ... as determined by the commissioner." Moreover, to enable those who have gained steady employment to remain in the workforce, the State continues to subsidize medical and child care expenses for two years after recipients have become ineligible for cash benefits. *Ibid.*

### B

The DHS has contracted with Mathematica Policy Research, Inc. (Mathematica), to examine the effectiveness of the WFNJ program. *See N.J.S.A.* 44:10–41 (calling for periodic public re-

ports and evaluations of WFNJ). The Department's agreement with Mathematica requires a series of six reports that evaluate how families are faring under the program. Mathematica's first report, released in 1999, found that during the initial eighteen months of WFNJ implementation, approximately one in three WFNJ participants exited the welfare system and entered the workforce. A survey of those who remained on welfare revealed that they faced a variety of more substantial impediments to employment, including low skills levels and less prior work experience.[4]

We note, as did the researchers themselves, that the first Mathematica report covered a period of strong economic growth and may not reflect real gains due to WFNJ. Further, information obtained after the first eighteen months of any new program may not be indicative of long term improvements, whereas subsequent evaluations are likely to provide more reliable data. In any event, the evaluations provided in the record before the Court do not indicate whether WFNJ has achieved (or will achieve) its goals.

## IV

### A

Plaintiffs bring this action under the New Jersey Constitution. Nonetheless, when cognate provisions of the Federal Constitution are implicated, we have turned to case law relating to those provisions for guidance. *See, e.g., State v. Schmid*, 84 *N.J.* 535, 549, 423 *A.*2d 615 (1980) (discussing free speech protections in

---

[4] The record also contains a Rutgers School of Social Work study of the FDP and a 1999 study conducted by Legal Services of New Jersey and the New Jersey Poverty Research Institute. Legal Services and the Poverty Research Institute surveyed Work First New Jersey participants and found that most knew about the goals of the Work First program and wanted to enter the workforce. Those surveyed also expressed concern about the adequacy of such necessary components of the program as transportation, child care and rent subsidies. The Rutgers study was not directed specifically toward the effects of the family cap combined with the provision of back-to-work services.

New Jersey within federal First Amendment framework), *appeal dismissed sub nom. Princeton Univ. v. Schmid,* 455 *U.S.* 100, 102 *S.Ct.* 867, 70 *L.Ed.*2d 855 (1982); *State v. Johnson,* 68 *N.J.* 349, 352–53, 346 *A.*2d 66 (1975) (analyzing defendant's search and seizure rights in light of federal Fourth Amendment jurisprudence).

 The Fourteenth Amendment of the United States Constitution provides that the state governments shall not "deny to any person within [their] jurisdiction the equal protection of the law," and shall not "deprive any person of life, liberty, or property[ ] without due process of law." *U.S. Const.* amend. XIV, § 1. Under the latter provision, citizens enjoy the right to be free from governmental intrusion in making procreative decisions. *Eisenstadt v. Baird,* 405 *U.S.* 438, 453, 92 *S.Ct.* 1029, 1038, 31 *L.Ed.*2d 349, 362 (1972). The extent to which statutory provisions are scrutinized under federal equal protection and right to privacy claims depends on the class of persons affected, the nature of the right implicated, and the level of interference. When a state statute directly impinges on a fundamental right or a suspect class, then the provision is strictly scrutinized, *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 *U.S.* 432, 440, 105 *S.Ct.* 3249, 3254, 87 *L.Ed.*2d 313, 320 (1985); *Carey v. Population Servs. Int'l,* 431 *U.S.* 678, 686, 97 *S.Ct.* 2010, 2016, 52 *L.Ed.*2d 675, 685 (1977); when a statute impairs a lesser interest, the federal courts ask only whether it is "rationally related to legitimate government interests." *Washington v. Glucksberg,* 521 *U.S.* 702, 728, 117 *S.Ct.* 2258, 2271, 138 *L.Ed.*2d 772, 792 (1997).[5] It follows, then, that the

---

[5] Although not relevant to our analysis in this case, the United States Supreme Court has developed an intermediate level of scrutiny for equal protection challenges involving certain governmental classifications, *e.g.,* classifications based on gender and out of wedlock birth status. *See, e.g., United States v. Virginia,* 518 *U.S.* 515, 533, 116 *S.Ct.* 2264, 2275, 135 *L.Ed.*2d 735, 751 (1996) (applying intermediate scrutiny and invalidating policy excluding women from state-funded military academy); *Mills v. Habluetzel,* 456 *U.S.* 91, 98–99, 102 *S.Ct.* 1549, 1554–55, 71 *L.Ed.*2d 770, 777–78 (1982) (applying intermediate

rational basis test is applied when economic legislation, including statutes that establish benefit programs, is challenged. *See Dandridge v. Williams*, 397 *U.S.* 471, 485–87, 90 *S.Ct.* 1153, 1161–63, 25 *L.Ed.*2d 491, 501–02 (1970) (upholding limits on welfare benefits as rationally related to legitimate government interest "in encouraging employment and ... avoiding discrimination between welfare families and the families of the working poor").

As noted earlier, the Third Circuit Court of Appeals and the federal District Court for New Jersey have considered the same claims that are now before this Court. In *C.K. I, supra,* plaintiffs brought a class action challenging a decision of the Secretary of the United States Department of Health and Human Services to waive certain federal welfare requirements and thereby to permit implementation of the family cap provision under FDA. 883 *F.Supp.* at 996–97. In addition to contesting the Secretary's authority to grant the waiver, plaintiffs claimed that the family cap violated their equal protection and fundamental privacy rights. *Id.* at 1012.[6] The court held that the family cap provision was "rationally related to the legitimate state interests of altering the cycle of welfare dependency ... [and] promoting individual responsibility and family stability." *Id.* at 1015. It reasoned that "by maintaining the level of ... benefits despite the arrival of an additional child, [the family cap] puts the welfare household in the same situation as that of a *working family, which does not automatically receive a wage increase*" when a new child is born. *Id.* at 1013–14.

*C.K. I* also rejected plaintiffs' privacy claims. The court observed that the birth of an additional child in a family on welfare does not result in a decrease in benefits under the cap. Rather, it

scrutiny and invalidating one-year statute of limitations for paternity suits brought on behalf of out of wedlock children).

6 As in this case, the *C.K. I* plaintiffs asserted that the cap impermissibly infringed on their decision to bear children and denied equal protection to children born when the family was receiving welfare benefits. *Id.* at 1012–13.

"remove[s] the automatic benefit increase associated with an additional child under the federal program." *Id.* at 1015. The court held that although women have a fundamental right to make procreative decisions, there is no constitutional right to government subsidies in furtherance of that right. *Ibid.* (citing *Harris v. McRae,* 448 *U.S.* 297, 316, 100 *S.Ct.* 2671, 2687–88, 65 *L. Ed.*2d 784, 804 (1980)).

The Third Circuit "ha[d] nothing to add to the district court's opinion [that plaintiffs' procreative rights are not burdened by the family cap] except to observe that it would be remarkable to hold that a state's failure to subsidize a reproductive choice burdens that choice." *C.K. II, supra,* 92 *F.*3d at 195.

## B

■ In the New Jersey Constitution, both equal protection and the right to privacy derive from the same broad constitutional language, which states: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness." *N.J. Const.* art. I, ¶ 1. Although Article I does not contain the terms "equal protection" or "right to privacy," it is well settled law that the expansive language of that provision is the source for both of those fundamental constitutional guarantees. *See Planned Parenthood, supra,* 165 *N.J.* at 629, 762 *A.*2d 620; *Right to Choose, supra,* 91 *N.J.* at 303, 450 *A.*2d 925.

■ Thirty years ago, Chief Justice Weintraub rejected "[m]echanical approaches to the delicate problem of judicial intervention under either the equal protection or due process clauses" of the New Jersey Constitution. *Robinson v. Cahill,* 62 *N.J.* 473, 491, 303 *A.*2d 273 (1973). He described the balancing process by which a court "[u]ltimately" decides equal protection and due process challenges:

[A] court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial.

[*Id.* at 492, 303 *A.*2d 273 (citation omitted).]

Later, in *Right to Choose, supra,* and in *Greenberg, supra,* the Court reaffirmed that approach, finding that it provided a more flexible analytical framework for the evaluation of equal protection and due process claims. In keeping with Chief Justice Weintraub's direction, we " 'consider[ ] the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction.' " *Planned Parenthood, supra,* 165 *N.J.* at 630, 762 *A.*2d 620 (quoting *Greenberg, supra,* 99 *N.J.* at 567, 494 *A.*2d 294 (citing *Right to Choose, supra,* 91 *N.J.* at 308–09, 450 *A.*2d 925 (1982))). By deviating from the federal tiered model, we are able to examine each claim on a continuum that reflects the nature of the burdened right and the importance of the governmental restriction. *See Planned Parenthood, supra,* 165 *N.J.* at 630, 762 *A.*2d 620 (noting "that in cases involving a classification that 'indirectly infringes on a fundamental right,' the inflexibility of the tiered framework prevents a full understanding of the clash between individual and governmental interests") (internal citations omitted). We point out, however, that although our mode of analysis differs in form from the federal tiered approach, the tests weigh the same factors and often produce the same result. *See Barone, supra,* 107 *N.J.* at 368, 526 *A.*2d 1055; *Greenberg, supra,* 99 *N.J.* at 567, 494 *A.*2d 294.

## C

We turn now to plaintiffs' claims that the family cap provision of WFNJ unconstitutionally infringes on a woman's right to make procreative decisions by penalizing her for choosing to bear a child and, further, that the cap improperly singles out

classes of poor children "based on their parents' reproductive choices and the timing of [their] birth."

Our discussion begins with an inquiry into the nature of the affected right. In *Right to Choose, supra,* we adverted to the "body of law . . . in New Jersey acknowledging a woman's right to choose whether to carry a pregnancy to full-term or to undergo an abortion." 91 *N.J.* at 303–304, 450 *A.*2d 925 (citing *Gleitman v. Cosgrove,* 49 *N.J.* 22, 62–63, 227 *A.*2d 689 (1967) (Weintraub, C.J., dissenting in part) (suggesting that woman with rubella had right to choose abortion); *Berman v. Allan,* 80 *N.J.* 421, 432, 404 *A.*2d 8 (1979) (establishing cause of action for deprivation of right to decide whether to bear child with Down's Syndrome); *Schroeder v. Perkel,* 87 *N.J.* 53, 66, 432 *A.*2d 834 (1981) (declaring right to abort second child when first child was born with cystic fibrosis)). Later, in *Planned Parenthood, supra,* we emphasized "the importance of a woman's right to control her body and her future, a right we as a society consider fundamental to individual liberty." 165 *N.J.* at 631–32, 762 *A.*2d 620. The Court was "keenly aware of the principle of individual autonomy that lies at the heart of a woman's right to make reproductive decisions and of the strength of that principle as embodied in our own Constitution." *Id.* at 632, 762 *A.*2d 620. That most basic right, plaintiffs allege, has been burdened impermissibly by the family cap provision of WFNJ.

It is, then, the nature of that burden or the extent of the governmental intrusion that we must consider. Plaintiffs claim that the family cap functions as a coercive tool designed to encourage poor women to avoid having children or to abort their pregnancies when the family unit is receiving welfare. By withholding an incremental increase in cash assistance, plaintiffs argue, the State unduly influences their procreative choices. But even if we assume that procreative choices are influenced by a cap on cash assistance to the family unit, we do not find that influence to be "undue," or that a new burden is thereby created. We expect that the income of a family unit, whatever the source, is likely to influence a woman's decision to conceive or bear a child.

That is true for most families in New Jersey. As noted by the federal courts, working families do not receive automatic wage increases when additional children are born. Indeed, the family cap appears to do no more than place welfare families "on a par with working families."[7] *C.K. I, supra,* 883 *F.Supp.* at 1013.

We also find that the DHS has presented ample justification for the family cap. The record informs us that resources available as a result of the cap have been diverted to job training, child care, and other programs established and expanded under WFNJ. The goals of promoting self-sufficiency and decreased dependency on welfare are laudable; the focus on education, job training and child care should advance those goals and, ultimately, result in improving the lives of children born into welfare families.

In *Right to Choose, supra,* the Court was presented with a challenge to legislation that denied Medicaid funding for abortions except when an abortion was medically necessary to save the life of the mother. 91 *N.J.* at 292, 450 *A.2d* 925. On considering plaintiffs' equal protection challenge, we stated:

> [T]here [is no] fundamental right to funding for an abortion. The right to choose whether to have an abortion, however, is a fundamental right of all pregnant women, including those entitled to Medicaid reimbursement for necessary medical treatment. *As to that group of women,* the challenged statute discriminates between those for whom medical care is necessary for childbirth and those for whom an abortion is medically necessary. Under [the statute] those needing abortions receive funds only when their lives are at stake. By granting funds when life is at risk, but withholding them when health is endangered, the statute denies equal protection to those women entitled to necessary medical services under Medicaid.
>
> [91 *N.J.* at 305–06, 450 *A.2d* 925 (citations omitted; emphasis added).]

The *Right to Choose* dichotomy is directly relevant to this case. There we held that the state could not distinguish between "those for whom medical care is necessary for childbirth and those for whom an abortion is medically necessary." *Id.* at 305, 450 *A.2d*

---

[7] *We point out that medical benefits and food stamp assistance are provided for children born after the family receives welfare and regardless of the family cap. Unlike working families, those benefits establish an "assistance floor" for welfare recipients.*

925. *See also Planned Parenthood, supra,* 165 *N.J.* at 634, 762 *A.*2d 620 (expressing concern that delay in obtaining abortion increases risk to health of mother). Most important, we also held that "[e]lective, nontherapeutic abortions ... do not involve the life or health of the mother, and the State may pursue its interest in potential life by excluding those abortions from the Medicaid program." *Right to Choose, supra,* 91 *N.J.* at 310, 450 *A.*2d 925. Here, the life or health of the mother is not at issue. Whatever the impact of the family cap on the family unit, that impact is no different from the impact of another child on any family with a fixed income. Like most women in New Jersey, a woman receiving welfare assistance will likely weigh the extent of the economic strain caused by the addition of a child to the family unit.[8] Ultimately, however, the decision to bring a child to term or to have an abortion remains wholly with the woman.

Plaintiffs also rely on the distinction created in WFNJ between children born before the family begins receiving welfare benefits, and similarly situated children born ten months after the receipt of such benefits. The family cap treats these classes disparately, plaintiffs argue, based on when mothers choose to exercise their fundamental right to conceive and bear children. In fact, the *family* does not receive additional cash assistance when a new child is born, although the family does receive additional food stamps and Medicaid benefits. All of the children in the family unit share presumably in the total amount of cash assistance available, as is the case in other similarly situated family units.[9]

---

[8] Plaintiffs have submitted studies and expert testimony suggesting that insufficient income may create health risks for children subject to the cap. DHS claims that there are other sources of income available to welfare recipients. We assume that, when necessary, DHS will insure the health and safety of families in need. *See Franklin v. Dep't of Human Servs.,* 111 *N.J.* 1, 4, 20, 543 *A.*2d 1 (1988) (relying on DHS plan to provide shelter for homeless families on the termination of emergency housing assistance).

[9] *Amici curiae* The Center for Economic and Social Rights, The International Women's Human Rights Law Clinic, and The Center for Constitutional Rights

## V

■ This case is not about a woman's right to choose whether and when to bear children, but rather, about whether the State must subsidize that choice. In *Right to Choose, supra,* we held that the State may decline to fund a woman's choice to obtain an abortion when the abortion is not medically necessary. We hold today that the State is not required to provide additional cash assistance when a woman chooses to bear a child more than ten months after her family has received welfare benefits. In so holding, we reject plaintiffs' claim that the family cap provision of WFNJ violates the equal protection and due process guarantees of our State Constitution.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ, and Justices COLEMAN, LONG, ZAZZALI, and ALBIN, and Judges HAVEY and KESTIN, temporarily assigned—7.

*Opposed*—None.

---

contend, *inter alia,* that *N.J.S.A.* 44:10–61(a) violates international norms related to birth-status discrimination. Under our analysis, that contention fails.