**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0952-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MICHAEL J. REILLY,

     Defendant-Appellant.

_____

        Argued November 16, 2020 – Decided March 3, 2021

        Before Judges Currier and DeAlmeida.

        On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Municipal Appeal No. 08-19.

        Thomas Cannavo argued the cause for appellant (The Hernandez Law Firm, PC, attorneys; Thomas Cannavo, of counsel and on the brief).

        Alexis R. Agre, Assistant Prosecutor, argued the cause for respondent (Scott A. Coffina, Burlington County Prosecutor, attorney; Alexis R. Agre, of counsel and on the brief).

PER CURIAM

Defendant appeals from the Law Division's order entered after a de novo trial on the record. The Law Division found defendant guilty of driving while intoxicated (DWI), N.J.S.A. 39:4-50, DWI with a minor in the motor vehicle, N.J.S.A. 39:4-50.15; possessing an open container of an alcoholic beverage in a motor vehicle, N.J.S.A. 39:4-51b; and delaying traffic, N.J.S.A. 39:4-56. We affirm.

We derive our facts from the testimony elicited at trial. On November 22, 2017, at approximately 10:37 p.m., Medford Township police officer John Sabados was on duty as a patrolman when he received a call reporting a car parked in an intersection "for a long period of time with loud music." Sabados responded to the scene and saw an SUV parked in an intersection, approximately ten feet past a stop sign. The engine was running, its lights were on, and there was loud music coming from the vehicle. Sabados could see the driver, later identified as defendant, "looking down or slouched down."

Sabados parked his police car behind the SUV and activated the emergency lights on his vehicle.[1] The officer got out of his car and approached the driver's side of defendant's car. As he stood at the driver's side window,

---

[1] This also activated the Motor Vehicle Recording (MVR) in Sabados's car. The MVR was part of the record reviewed by this court.

Sabados observed defendant looking down at his cell phone in his lap.  Sabados knocked on the window several times before defendant noticed him.  The officer described defendant as "shocked" and then he lowered his window a few inches.

Sabados saw a "small child" in a car seat in the backseat of defendant's car, and a "half empty" "pint-size, 750 milliliter" bottle of Fireball whisky was in the front center console.  Sabados stated he "detected the odor of alcoholic beverage emanating from the vehicle."  Defendant said the whisky belonged to his fiancée, who he had recently dropped off at their home after an argument.  Afterwards, defendant stated he went for a drive with his daughter to cool off.

When Sabados asked defendant for certain documents, defendant "fumbled" to remove his license, taking a period of time to produce it.  He eventually gave the officer the registration for a different vehicle and an expired insurance card.  Defendant told Sabados he had gone to dinner with his fiancée earlier in the evening where he consumed two or three drinks.  Sabados noted defendant's slurred speech and bloodshot eyes.

Sabados then asked defendant to exit his car and walk to the front of the police car to perform standardized field sobriety tests.  To perform a horizontal gaze nystagmus test, Sabados instructed defendant to follow a pen using only his eyes and not to move his head.  Sabados said defendant moved his head to

follow the pen several times. Sabados also detected the odor of alcohol emanating from defendant's mouth as he stood next to him.

Before conducting a walk-and-turn test, Sabados asked defendant if he had any issues with his legs which would affect his ability to walk or stand in a straight line. Defendant responded that he had no cartilage in his right leg, which affected his ability to both bend and walk.

The officer instructed defendant to put his left foot in front of his right foot with his hands down at his sides, demonstrating the position for him. He also asked defendant to take nine heel-to-toe steps forwards and nine steps backwards along an imaginary line. Defendant failed to keep his hands down at his side, failed to walk heel-to-toe, failed to properly turn, and stepped off the imaginary line multiple times.[2]

Prior to conducting the one-leg stand test, Sabados again inquired whether defendant had any injuries that would affect his ability to stand on one leg. When defendant indicated he had a bad leg, Sabados asked whether standing on the other leg would help defendant and defendant replied "yes". Sabados then instructed defendant to stand with his feet together with his arms down at his

---

[2] A review of the MVR shows defendant unable to maintain his balance while performing this test.

sides. Sabados told defendant to lift the leg of his choice, directly in front of him, six inches above the ground, and, while staring at his raised foot, to count out loud until the officer instructed him to stop. Sabados again demonstrated the proper position.

Defendant attempted to perform the test by lifting his right leg. In doing so, he swayed, put his foot down several times, failed to keep his arms at his sides, failed to look at his raised foot, and slurred his speech while counting. At one point, defendant stated he had a bad knee. In light of his observations and defendant's inability to perform the field sobriety tests, Sabados concluded defendant was unfit to operate a motor vehicle and arrested him for DWI.

Once defendant was seated in the back of the police car, Sabados noted the strong odor of alcohol. He also detected the odor of alcohol emanating from defendant's mouth once he was brought to the police station.

Defendant was tried on the DWI and other related charges in municipal court on two days in January and March 2019. The Alcotest results were ruled inadmissible because of a break in the officers' direct observation of defendant prior to the administration of the test. The State presented Sabados as its witness.

5

Kevin Flanagan, a former State Trooper, was qualified as an expert in the administration of field sobriety tests. Flanagan opined that Sabados did not instruct defendant properly regarding the tests. He also stated that defendant's orthopedic condition with his knee would cause him pain and his obesity might cause him difficulty in performing the tests. On cross-examination, Flanagan conceded that defendant failed the tests and it was only possible that his physical condition affected his performance.

Defendant also introduced testimony from Dr. Lawrence Guzzardi, M.D., qualified as an expert in the areas of emergency medicine, medical toxicology, and orthopedic trauma. Dr. Guzzardi testified that he reviewed a medical record that indicated defendant had sustained a metatarsal fracture in his right foot in 2011. In addition, Dr. Guzzardi stated he reviewed chiropractic records from March 2014 in which defendant complained of back pain and stiffness, and hip and rib cage discomfort. An MRI of the lower spine in 2014 revealed bulging discs.

Dr. Guzzardi also testified regarding his review of additional records in 2014 in which defendant was diagnosed with a degenerative condition – a meniscal tear in his right knee. Although the meniscus was repaired, Dr. Guzzardi stated defendant continued to have recurring pain and swelling in the

6

knee. Dr. Guzzardi opined that defendant's orthopedic issues and obesity adversely impacted his ability to complete the field tests.

Dr. Guzzardi also stated that the video footage of defendant's arrest did not conclusively establish defendant's intoxication. He opined that defendant's initial slurring was not due to intoxication because defendant's speech returned to normal at a rate faster than alcohol dissipates. Guzzardi expressed his belief that defendant's slurred speech was due to being suddenly awakened by Sabados.

On cross-examination, Dr. Guzzardi admitted he did not examine defendant at any time. He also conceded he did not know the condition of defendant's knee or back at the time of defendant's arrest. Although the doctor agreed defendant exhibited signs of impairment on the MVR, he found there were other explanations for his demeanor and behavior other than alcohol intoxication.

On May 1, 2019, the municipal court judge issued an oral decision. He initially advised that he found all of the witnesses to be credible. Having reviewed the videotape, the judge noted that when Sabados arrived at the scene, defendant's car was parked in the middle of an intersection. There was very loud music coming from the interior of the car and defendant did not respond to the police car's overhead lights or the initial knocks on the window.

7

The judge found defendant was unable to maintain his balance and had "significant slurring" of his speech. Although the judge noted defendant told Sabados he had orthopedic issues with his right knee, he nevertheless had trouble performing the field sobriety tests that appeared unrelated to any problems with his knee. The judge concluded that "given the totality of the circumstances, [and] all of the observations," defendant was guilty of DWI, DWI with a minor in the car, possessing an open container of alcohol in the car, and delaying traffic.

The court sentenced defendant as a third DWI offender[3] to 180 days in the county jail, ten years' loss of driver's license with eleven years of ignition interlock to run concurrently, forty-eight hours at the Intoxicated Driver Resource Center, as well as a $1006 fine, and various fines and surcharges. For the DWI with a minor in the car conviction, the judge imposed an additional six months' loss of driving privileges to run consecutively with the suspension for defendant's DWI conviction, as well as an additional fine and court costs. The court stayed the jail sentence pending the outcome of the appeal.

---

[3] This was defendant's fourth DWI offense. Defendant was convicted of two DWIs in the 1990s and when he was convicted a third time more than ten years later, he was given the benefit of the "step down" provision in N.J.S.A. 39:4-50(a)(3).

Defendant appealed to the Law Division where the court conducted a trial de novo on the record. On October 9, 2019, the Law Division judge issued an oral decision, finding defendant guilty of the four charges. The judge stated:

> [A]fter fully reviewing . . . several times all of the evidence, I find the State has met the burden of proof and I find beyond a reasonable doubt, and I am firmly convinced that on November 22nd at 10:37 and thereafter, [defendant] was operating a motor vehicle while under the influence of alcohol. I find from the totality of the evidence and circumstances that I am firmly convinced that [defendant] had a substantial deterioration of his physical capabilities from alcohol. And as a result, it was improper and illegal for him to operate a motor vehicle.

The Law Division judge explained his reasoning based on the officer's observations and his own review of the MVR:

> The motor vehicle, where it was and how it was stopped at the -- the amount of time[] it was stopped at an intersection, very strange. Bloodshot eyes, yes, not proof maybe, but they were noted. The odor of alcohol was clear, there was an opened container of alcohol in the motor vehicle, which [] defendant was operating.
>
> There was slurred speech, there was some problems retrieving correct documents. There was the result of the field sobriety test, there was the video and what could be observed in that. There was a child in the car after an argument with the other member of the family. There was blaring music. . . . And [] defendant apparently was either somewhat asleep and nodding out there when awakened by the officer or he was, in fact, operating a cell phone down by his legs while seated.

9

In addressing the charge for delaying traffic, the judge found:

> As far as delaying traffic, I mean, it's all part of the [c]ourt's decision as to DUI and, I mean, I didn't see any traffic delay, frankly, as a fact in here, but he had the capability of doing it. But certainly, there were cars that passed by that I saw and although the [c]ourt below found him guilty of that, I find it's really part and parcel to driving under the influence.

The court imposed a similar sentence as the municipal court with three exceptions. First, on defendant's DWI conviction, the judge offered defendant the right to apply for a ninety-day inpatient rehabilitation program in lieu of ninety days of incarceration. The judge also ran the six-month license suspension for the conviction of DWI with a minor in the car concurrent, rather than consecutive, with the ten-year license suspension under the third DWI conviction. Finally, the judge merged defendant's delaying traffic conviction into his DWI conviction for sentencing purposes.

Defendant argued he should be sentenced under the recently amended, but not yet effective, DWI law.[4] In denying the application, the judge stated:

---

[4] On August 23, 2019, N.J.S.A. 39:4-50 was amended to expand the use of ignition interlock devices and reduce the duration of license forfeitures. See DRIVING UNDER INFLUENCE OF ALCOHOL OR DRUGS—IGNITION INTERLOCK DEVICES (L. 2019, c. 248); see also Administrative Directive #25-19, "Implementation of New DWI Law (L. 2019, c. 248) – Includes Expanded Use of Ignition Interlock Devices for First-Time Offenders" (Dec. 4,

> With all due respect to the various arguments, I would just say that I happen to agree that this law that is being asked to be applied is not even in effect. This is a case that goes back for two years as to the date of the allegations of the violation. I can't agree that he should be sentenced under a new law that is not in effect yet . . . .

The Law Division judge stayed defendant's jail sentence pending appeal to this court.

Defendant presents the following issues on appeal:

> I. THE LAW DIVISION ERRED IN FINDING DEFENDANT GUILTY OF THE OBSERVATIONAL PRONG OF THE DWI OFFENSE
>
> II. ONCE ACQUITTED OF DWI, THEN THE N.J.S.[A.] 39:4-50.15 CONVICTION MUST ALSO RESULT IN AN ACQUITTAL
>
> III. THERE IS INSUFFICIENT EVIDENCE IN THE RECORD OF DELAYING TRAFFIC. THUS, THE LAW DIVISION ERRED IN FINDING DEFENDANT GUILTY OF N.J.S.[A.] 39:4-56 AND DEFENDANT SHOULD THEREFOR[E] BE ACQUITTED OF THIS OFFENSE

---

2019). Relevant to this appeal is the reduction of license forfeiture for third DWI offenders from ten to eight years. These amendments became effective and "shall apply to any offense occurring on or after" December 1, 2019, approximately four months after enactment so that "[t]he Chief Administrator of the New Jersey Motor Vehicle Commission may take any anticipatory administrative action in advance of that date as shall be necessary to implement the provisions of this act." L. 2019, c. 248.

IV. THE LAW DIVISION ERRED IN FAILING TO SENTENCE DEFENDANT PURSUANT TO LAWS OF 2019, C. 248 AS A THIRD DWI OFFENDER SENTENCED DE NOVO AFTER THE PASSAGE OF THE ACT. THUS, IF NOT ACQUITTED OF DWI, [] DEFENDANT'S SENTENCE SHOULD BE CORRECTED TO AN EIGHT-YEAR LICENSE FORFEITURE INSTEAD OF A TEN-YEAR LICENSE SUSPENSION

A. FAILURE TO APPLY THE NEW DWI SENTENCING LAW TO THIS DEFENDANT AND ANY THIRD OFFENDER SENTENCED AFTER ITS AUGUST 23, 2019 PASSAGE[] VIOLATES DEFENDANT'S CONSTITUTIONAL EQUAL PROTECTION RIGHTS

B. EVEN IF THE EFFECTIVE DATE PROVISION OF THE NEW DWI SENTENCING LAW IS UPHELD AS CONSTITUTIONAL, AS A MATTER OF FUNDAMENTAL FAIRNESS AND INHERENT AUTHORITY OF OUR COURTS TO RETROACTIVELY SENTENCE TO AMELIORATIVE TERMS, THIS DEFENDANT AND ALL THIRD DWI AND REFUSAL OFFENDERS SENTENCED AFTER AUGUST 23, 2019 SHOULD BE SO SENTENCED UNDER THE PROVISIONS OF LAWS OF 2019, C. 248.

Defendant contends the Law Division erred in finding him guilty of DWI because there was insufficient evidence to satisfy the required observational prong under N.J.S.A. 39:4-50. We disagree.

Our review is "limited to determining whether the Law Division's de novo findings 'could reasonably have been reached on sufficient credible evidence

12 A-0952-19

present in the record.'" State v. Palma, 426 N.J. Super. 510, 514 (App. Div. 2012) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

> [We] defer to trial courts' credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record. [T]he rule of deference is more compelling where . . . two lower courts have entered concurrent judgments on purely factual issues. Under the two-court rule, appellate courts ordinarily should not undertake to alter concurrent findings of facts and credibility determinations made by two lower courts absent a very obvious and exceptional showing of error.
>
> [State v. Locurto, 157 N.J. 463, 474 (1999) (citations omitted).]

In reviewing a trial judge's conclusions in a non-jury case, substantial deference is given to the trial court's findings of fact. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84 (1974)). These findings should only be disturbed when there is no doubt that they are inconsistent with the relevant, credible evidence presented below, such that a manifest denial of justice would result from their preservation. Id. at 412. We owe no deference to the trial judge's legal conclusions. Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995).

N.J.S.A. 39-4:50 prohibits the operation of a motor vehicle while under the influence of intoxicating liquor or drugs. This offense may be proven in

A-0952-19

either of two alternative methods: (1) proof of a defendant's blood alcohol level; or (2) proof of a defendant's physical condition. State v. Kashi, 360 N.J. Super. 538, 545 (App. Div. 2003). "The statute does not require as a prerequisite to conviction that the accused be absolutely 'drunk' in the sense of being sodden with alcohol. It is sufficient if the presumed offender has imbibed to the extent that his physical coordination or mental faculties are deleteriously affected." State v. Nemesh, 228 N.J. Super. 597, 608 (App. Div. 1988) (citing State v. Emery, 27 N.J. 348, 355 (1958)).

In State v. Morris, 262 N.J. Super. 413, 416, 421 (App. Div. 1993), this court upheld a DWI conviction, finding that slurred speech, disheveled appearance, bloodshot eyes, alcoholic odor on breath, and abrasive demeanor were evidence of the defendant's intoxication. See also State v. Buglione, 233 N.J. Super. 110, 112 (App. Div. 1989) (upholding DWI conviction based on the defendant's conduct in driving his car, demeanor, bloodshot eyes, swaying, and odor of alcohol).

Here, in his de novo review, the Law Division judge found Sabados's testimony credible. The judge noted the officer's observations of defendant's bloodshot eyes, the odor of alcohol in the vehicle and on defendant's breath, defendant's slurred speech and his difficulty in retrieving documents, the blaring

14

music and defendant's failure to notice the police car's overhead lights or the officer's knocking on the window.

Moreover, the judge viewed the MVR himself and corroborated defendant's slurred speech, difficulty retrieving his documents and his inability to perform the field sobriety tests. In addition, there was an open container of alcohol in the vehicle. And, the car was stopped in an intersection for a long period of time.

We discern no basis to disturb the Law Division judge's decision. His findings are supported by the substantial credible evidence. He determined under all of the circumstances that defendant was under the influence of alcohol while driving his vehicle. Therefore, we affirm the convictions under N.J.S.A. 39:4-50 and 39:4-50.15.

Defendant also contends the Law Division erred in finding him guilty of N.J.S.A. 39:4-56, delaying traffic. We are unconvinced.

The statute provides: "No person shall drive or conduct a vehicle in such condition . . . as to be likely to cause delay in traffic . . . ." N.J.S.A. 39:4-56. A reading of the plain language clearly indicates that the State need not establish defendant's operation of his vehicle caused an actual delay in traffic, rather, only that such operation was likely to cause a delay. See Marino v. Marino, 200 N.J.

315, 329 (2009) (alteration in original) (quoting O'Connell v. State, 171 N.J. 484, 488 (2002)) (noting "[Courts] will not 'rewrite a plainly-written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language.'").

Here, the Law Division judge convicted defendant under the statute because the way he operated his car "had the capability of [delaying traffic]." The judge's conclusion was supported by the evidence in the record showing defendant's car was parked, with the lights on and engine running, in an intersection approximately ten feet beyond a stop sign. The MVR also shows several cars driving through the intersection and around defendant's car. We are satisfied there is sufficient and credible evidence in the record to support the judge's finding that defendant's conduct was likely to delay traffic.

In challenging his sentence, defendant contends the Law Division judge erred by not sentencing him under the amended DWI law. Again, we disagree.

On August 23, 2019, the Legislature amended N.J.S.A. 39:4-50 to expand the use of ignition interlock devices and reduce the duration of license forfeitures. Applicable to defendant, the amendment reduced the period of license forfeiture for third DWI offenders from ten years to eight years.

16

However, the law did not become effective until December 1, 2019 so that "[t]he Chief Administrator of the New Jersey Motor Vehicle Commission m[ight] take any anticipatory administrative action in advance of that date as shall be necessary to implement the provisions of this act." L. 2019, c. 248. In addition, the statute indicated it was applicable only to offenses that occurred after that date.

Our Supreme Court has established "well-settled" principles governing statutory interpretation. In re Kollman, 210 N.J. 557, 568 (2012). Under these principles, a court's "primary goal when interpreting a statute is to determine and carry out the Legislature's intent." Ibid. (citing Allen v. V. & A Bros., Inc., 208 N.J. 114, 127 (2011)). This process begins with the statutory language. Ibid. "[Courts] ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citations omitted). If the plain language is clear, the court's task is complete. N. J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 549 (2012) (citation omitted). Under the plain language of the statute, because the offense of which defendant was convicted occurred in November 2017, he was not entitled to the benefit of the amended law.

17

We are not persuaded by defendant's argument that the trial court violated his equal protection rights in not retroactively applying the amended law. Specifically, defendant contends the four-month period between the law's passage and its effective date was imposed without a rational basis.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," meaning that all persons similarly situated should be treated alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyer v. Doe, 457 U.S. 202, 216 (1982)).  The general rule is that legislation is presumed to be valid if the statute's classification is rationally related to a legitimate state interest.  Id. at 440 (citing Schweiker v. Wilson, 450 U.S. 221, 230 (1981)).

Within the New Jersey Constitution, the principle of equal protection derives from constitutional language, which states: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."  N.J. Const. art. I, ¶ 1.  Article I does not contain the term "equal protection."  However, "it is well settled law that the expansive language of that

provision" is the source for this "fundamental [state] constitutional guarantee[]." Sojourner A. v. N.J. Dep't of Human Servs., 177 N.J. 318, 332 (2003) (quoting Planned Parenthood of Cent. N.J. v. Farmer, 165 N.J. 609, 629 (2000)).

An equal protection analysis under the New Jersey Constitution slightly differs from analysis of this fundamental right under the United States Constitution. Greenberg v. Kimmelman, 99 N.J. 552, 567 (1985). In Robinson v. Cahill, 62 N.J. 473, 491-92 (1973), our Supreme Court began to develop an independent analysis of state constitutional rights under Article I, Paragraph 1, that "rejected two-tiered equal protection analysis . . . and employed a balancing test in analyzing claims under the state constitution." Greenberg, 99 N.J. at 567 (quoting Taxpayers Ass'n of Weymouth Twp. v. Weymouth Twp., 80 N.J. 6, 43 (1976)). That balancing test considers "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." Ibid. (citing Right to Choose v. Byrne, 91 N.J. 287, 308-09 (1982)).

In later cases, the Court at times has applied traditional federal tiers of scrutiny to an equal protection analysis, instead of a balancing test. "Where a statute does not treat a 'suspect' or 'semi-suspect' class disparately, nor affect a fundamental right [including a liberty interest], the provision is subject to a

19

'rational basis' analysis." State v. Lagares, 127 N.J. 20, 34 (1992) (citing Dandridge v. Williams, 397 U.S. 471 (1970)). Under this analysis, the government action only must be "rationally related to the achievement of a legitimate state interest." Ibid. (citing Byrne, 91 N.J. at 305); see also Lewis v. Harris, 188 N.J. 415, 443 (2006).

Although the terms of the balancing test and the tiered-scrutiny test differ, the Court in Sojourner pointed out that "although our mode of analysis [under the New Jersey Constitution] differs in form from the federal tiered approach, the tests weigh the same factors and often produce the same result." 177 N.J. at 333 (citing Barone v. N.J. Dep't of Human Servs., 107 N.J. 355, 368 (1987)).

Here, the four-month period between the adoption and effective date of the new DWI law need only pass rational basis review. The revocation of an individual's driver's license no doubt constitutes a serious penalty; however, it does not rise to the level of the deprivation of a fundamental right. See State v. Hamm, 121 N.J. 109, 125 (1990). Moreover, individuals such as defendant, who will have their licenses revoked for ten years rather than eight years for their third DWI offense, do not constitute a "suspect" class. See Barone, 107 N.J. at 365 (citing San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 28 (1973)) (defining a suspect class as one "saddled with such disabilities, or subjected to

20

such a history of purposeful unequal treatment or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.").

In amending the DWI statute, the Legislature provided the required rational basis for the four-month delay from the passage date until the December 1, 2019 effective date. The Legislature expressly stated the delay was imposed so that "[t]he Chief Administrator of the New Jersey Motor Vehicle Commission may take any anticipatory administrative action in advance of that date as shall be necessary to implement the provisions of this act." L. 2019, c. 248.

Defendant has not established the Legislature's proffered justification for the four-month delay was "wholly unrelated to the legislative objective." Acuna v. Turkish, 354 N.J. Super. 500, 512 (App. Div. 2002) (citation omitted). Therefore, defendant's equal protection argument fails.

Defendant also argues the trial court erred in not using its inherent authority to retroactively apply the amended DWI law. He contends the amendments to the existing DWI law were curative and/or ameliorative and thus justify retroactive application.

Generally, the law favors prospective, rather than retroactive, application of new legislation unless a recognized exception applies. James v. N.J. Mfrs.

Ins. Co., 216 N.J. 552, 563 (2014). Courts must apply a two-part test to determine if a statute should be applied retroactively: (1) whether the Legislature intended to give the statute retroactive application; and (2) whether retroactive application "will result in either an unconstitutional interference with vested rights or a manifest injustice." Ibid. (citation omitted). Under the first prong of the James test, there are three circumstances that will justify the retroactive application of a statute: (1) where the Legislature has declared such an intent, either explicitly or implicitly; (2) where the expectations of the parties warrant retroactive application; and (3) where the statute is curative or ameliorative. Matter of D.C., 146 N.J. 31, 51 (1996).

A curative law is one which "amends a previous law which is unclear or which does not effectuate the actual intent of the Legislature in adopting the original act." Schiavo v. John F. Kennedy Hosp., 258 N.J. Super. 380, 386 (App. Div. 1992). The purpose of a curative amendment is merely to "remedy a perceived imperfection in or misapplication of a statute." Ibid. The amendment explains or clarifies existing law and brings it into "harmony with what the Legislature originally intended." Ibid.

The term "ameliorative" "refers only to criminal laws that effect a reduction in a criminal penalty." Street v. Universal Mar., 300 N.J. Super. 578,

582 (App. Div.1997) (quoting Kendall v. Snedeker, 219 N.J. Super. 283, 286 (App. Div. 1987)). Further, "[e]very statutory amendment which ameliorates or mitigates a penalty for a crime is not automatically subject to a presumption of retroactivity. The ameliorative amendment must be aimed at mitigating a legislatively perceived undue severity in the existing criminal law." Kendall, 219 N.J. Super. at 286 n.1.

Here, there is no evidence that the Legislature intended the amended DWI law to apply retroactively. To the contrary, the statute clearly provided, "[t]his act shall take effect on the first day of the fourth month after enactment and shall apply to any offense occurring on or after that date[.]" L. 2019, c. 248. In addition, a directive from the Administrative Office of the Courts dated December 4, 2019 stated, "the new sentencing provisions apply only to defendants charged with a DWI or refusal on or after December 1, 2019."[5]

Moreover, this court has previously considered this argument and rejected it on several occasions. In State v. Chambers, 377 N.J. Super. 365 (App. Div. 2005), the State appealed the court's retroactive application of N.J.S.A. 39:4-50 which imposed a DWI sentence enacted after the date of the offense and after

---

[5] AOC directives are "unquestionably binding on all trial courts." State v. Morales, 390 N.J. Super. 470, 472 (App. Div. 2007).

A-0952-19

the municipal sentence. We reversed, finding N.J.S.A. 1:1-15 prohibited the retroactive application of a statutory amendment reducing a criminal penalty unless the amendment expressly stated it applied retroactively. Id. at 372. We held the amended statute was not ameliorative because the defendant incurred the penalty under the former version of the statute at the time of the municipal sentencing, prior to the amendment's effective date. Id. at 374-75. See also State v. Kostev, 396 N.J. Super. 389, 391 (App. Div. 2007) (stating a defendant is subject to the sentencing options available at the time of his or her DWI offense); State v. Luthe, 383 N.J. Super. 512, 514 (App. Div. 2006) (stating where the statutory mandate is clear, "we need not resort to extrinsic evidence to discern the Legislature's intent in enacting this amendment."). Defendant has not met the James test to apply the amended statute retroactively.

Defendant also has not demonstrated the Legislature amended the DWI law because it was unclear or failed to effectuate the legislative intent behind the law. Rather, the legislative findings at the beginning of the amendments indicate the Legislature implemented the change to expand the use of ignition interlock devices because such devices "are more effective in deterring drunk driving than license suspension." L. 2019, c. 248. Given the absence of any

indication that the amendment was meant to clarify the existing DWI law, it cannot be said that the amendment was curative in nature.

Nor can the amendment be classified as ameliorative. The new law "significantly expands" the use of ignition interlock devices. While this expansion is accompanied by a lessening of the period of license forfeiture, including a reduction from ten to eight years for third DWI offenders, there is no indication that the law was amended because the Legislature perceived an undue severity in the existing penalties for DWI convictions. There is no suggestion that the Legislature found the previous license forfeiture period was unduly harsh. Rather, the amendment was intended to introduce more effective penalties. Defendant has not established any error in the trial court's decision to decline sentencing him under the amended law.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0952-19