**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2881-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

VANDANA RUPANI,

    Defendant-Appellant.

_____

> Submitted November 16, 2020 – Decided February 12, 2021
>
> Before Judges Currier and DeAlmeida.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Municipal Appeal No. 7-19.
>
> The Hernandez Law Firm, PC, attorneys for appellant (Thomas Cannavo, of counsel and on the brief).
>
> Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Russell J. Curley, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Vandana Rupani appeals from the Law Division's February 18, 2020 order entered after a de novo trial on the record. The Law Division found defendant guilty of the following charges: driving while intoxicated (DWI), N.J.S.A. 39:4-50; refusal to submit to chemical test (refusal), N.J.S.A. 39:4-50.2; reckless driving, N.J.S.A. 39:4-96; leaving the scene of an accident; N.J.S.A. 39:4-129(b), failure to report an accident, N.J.S.A. 39:4-130 and consumption of an alcoholic beverage while operating a motor vehicle, N.J.S.A. 39:4-51a. We affirm.

I.

On September 26, 2018, at approximately 8:45 p.m., police were dispatched to a residence following a report of a motor vehicle accident. On arrival, police observed tire marks on the front lawn, a tree had been run over, and the driveway was scraped as if a vehicle had driven up the driveway and turned around. At a neighboring home, police found the front end of a bumper as well as a license plate and bracket.

When the police entered the license plate number in the database, they discovered it was registered to a vehicle under the last name Rupani with an address located approximately ten minutes away. Upon arriving at the address, the police saw a car parked in the driveway with its engine running. The car

had a flat tire and the front end was damaged and missing its front license plate. As the officers approached the vehicle, they observed a female occupant, later identified as defendant, sitting in the driver's seat with a "flushed face" and "vomit all over herself." Upon closer inspection, the officers saw "small wine bottle containers" opened and empty on the passenger side floorboard as well as "vomit all over the interior compartment of the vehicle." They also detected "an odor of alcohol emanating from within the vehicle."

The officers identified themselves and asked defendant to turn off the ignition and exit the car. Defendant did not respond and instead "shuffl[ed] her body around" inside the car. She also did not respond to the officers' request to produce identification. Therefore, the officers reached in through the car's open back window, unlocked the car, and removed the keys from the ignition.

When defendant attempted to exit the car, she could not maintain her balance and she fell onto the lawn. The officers asked defendant if she had been drinking; she replied that she had consumed three glasses of wine. Defendant continued to struggle to maintain her balance and "couldn't stand up on her own." The officers described her speech as "incredibly slurred" and

3

her eyes were "glassy, glossy, bloodshot, [and] droopy." Defendant's clothes were "disheveled" and "covered in vomit."

Defendant was unable to perform any of the requested standardized field sobriety tests. As a result, and in addition to the officers' observations of defendant, the police concluded she had been driving while intoxicated. The officers also stated defendant was uncooperative in their attempts to arrest her and apply handcuffs. While at headquarters, defendant refused to submit to an Alcotest. Multiple charges were lodged against her, including, and related to the DWI offense.

## II.

Defendant first appeared in municipal court on October 31, 2018. When the judge asked defendant whether she was aware of all the charges against her, she responded affirmatively. As defendant appeared pro se, the court also inquired whether she intended to acquire an attorney. When defendant said "yes", the court adjourned the matter for two weeks. The judge told defendant that if she was unable to afford an attorney, he would discuss a public defender application with her at the next court appearance. The judge then discussed at length the penalties defendant was facing as a third DWI offender, including

A-2881-19

losing her driving privileges for ten years. The judge concluded by telling defendant her goal for the next couple of weeks was to procure an attorney.

On November 13, 2018, defendant appeared pro se before a different municipal court judge. She stated she was applying for a public defender because she had been unemployed since June or July of 2018. The judge approved defendant's public defender application and informed her she would be represented at her next court proceeding.

On December 13, 2018, defendant appeared before a third municipal court judge. She was represented by public defender Anthony Fazioli. When counsel indicated he had not yet received discovery, the judge adjourned the case for two weeks.

On January 3, 2019, defendant appeared in court, again represented by Mr. Fazioli. She was granted another two-week adjournment when defense counsel indicated he had only received "paper discovery" and not the motor vehicle recording or police headquarters video.

Three weeks later, when defendant arrived in court, she was represented by a different public defender. Because the prosecutor had still not served the requested discovery and because defendant said she felt "more comfortable dealing with [Mr. Fazioli]," her case was adjourned again.

5

During defendant's court appearance on February 19, 2019, she was represented by Mr. Fazioli who advised the court that they were ready for trial. When the judge inquired whether defendant was represented by private counsel or the public defender's office, Mr. Fazioli responded it was "a public defender matter." The judge then indicated he would tell the prosecutor to subpoena "all the officers" and trial would take place in March.

On March 25, 2019, defendant appeared before the original municipal court judge. She was represented by a fourth public defender. The judge stated he had discussed the matter with the prosecutor and public defender, and he wanted to explain to defendant the penalties she was facing. The judge told defendant she would receive a mandatory ten-year license suspension if convicted as a third DWI offender, as well as another mandatory ten-year license suspension for the refusal charge that was required to run consecutively with the DWI sentence. The judge further advised defendant she had the option to enter into a plea deal, but he was "not forcing [her] to enter a plea," and simply "want[ed] her to understand the consequences" if she did not. Defendant then consulted with counsel for approximately thirty minutes.

When defendant returned, she told the judge that she needed time to "get an actual lawyer." She said she had never looked for a lawyer because she was

A-2881-19

looking for a job and had no money. After further inquiry about her financial situation, she told the court she would "figure something out."

Defendant then informed the court that Mr. Fazioli had previously told her she was only facing charges for property damage and she was "shocked" to learn this was not the case. Defendant maintained she had been told five or six times that she was only facing a "property damage case." Defendant said she did not want a trial but needed "time to think, to get an actual lawyer."

The judge then asked the prosecutor whether he had offered defendant a plea. The prosecutor stated he offered to dismiss all of the other charges if defendant pled guilty to DWI. The public defender advised he had offered the plea deal to defendant and recommended she accept it. Defendant rejected the offer.

Defendant continued to interrupt the judge, professing her innocence of DWI and stating she needed time to think and she would borrow money to retain counsel. The court responded that defendant's case had been adjourned for more than five months. He advised defendant she had never requested private counsel despite numerous opportunities to do so, and she was aware for many weeks that this date was her trial date.

A-2881-19

The trial then began with the State producing its witnesses. Defendant did not present any witnesses on her behalf. At the end of the evening, the judge set a date for closing arguments and to make his ruling.

On April 1, 2019, the parties reconvened, and counsel gave their closing arguments. Thereafter, the judge issued an oral decision. He found the officers' testimony was credible and consistent. After recounting the facts, the judge found defendant guilty of DWI, refusal, reckless driving, consuming an alcoholic beverage in a motor vehicle, leaving the scene of an accident, and failure to report an accident. The judge found defendant not guilty of DWI in a school zone and resisting arrest.

The court sentenced defendant as a third offender on the DWI conviction and imposed ten years' license revocation, three years of an ignition interlock device and 180 days in jail with the option to apply for ninety days at an impatient facility in lieu of jail time, in addition to statutory fines. Defendant was also sentenced as a third offender on the refusal charge and the court imposed a mandatory ten-year license revocation, to run consecutively with the revocation imposed for the DWI charge, as well as three years of ignition interlock and associated fines and assessments.

When defendant again protested that she was not permitted to get a lawyer, the judge replied that she was represented by "a very good lawyer." He then stated:

> [Defendant] made certain statements before this trial started that she had conversations with Mr. Fazioli, another public defender, in which her statement was, to paraphrase her, that Mr. Fazioli indicated to her that this was just a minor problem, that the matter would just go away, it's [sic] only dealt with property damage.
>
> . . . .
>
> I had an opportunity to speak to Mr. Fazioli, just to verify if in fact he had made any such representation to you. He adamantly denied that. Adamantly denied, other than telling you – advising you of the difficulties that you are facing. Certainly would never make any statement that someone facing the charges that you are facing should just be so flipp[an]t as to believe they would just go away. Adamantly denied it. I am putting that on the record.

Another long exchange then occurred between the judge and defendant during which defendant continued to maintain she was inadequately represented. Defendant also stated that she wanted to enter into a plea deal. The judge reminded her that she was offered a "reasonable" plea deal which she had rejected against her counsel's advice.

9

III.

Defendant appealed to the Law Division where the court conducted a de novo trial on the record. The court also stayed the jail sentence pending appeal. In a comprehensive written opinion issued January 24, 2020, the Law Division judge found defendant guilty of DWI and all of the other related charges. The judge also addressed and rejected defendant's additional arguments: (1) whether she was entitled to have her case adjourned so she could hire new counsel; (2) whether the municipal court judge should have recused himself, and if so, whether the case should be remanded for a new trial with a different judge; (3) whether the municipal court judge violated her right to testify; and (4) whether she had ineffective assistance of counsel.

During her sentencing hearing, defendant argued the newly amended DWI law was applicable to her.[1] The amendment changed the mandatory license revocation period from ten to eight years for third DWI offenders. The judge declined to apply the new DWI law retroactively given its "unambiguous" language that it only applied to any offense occurring on or

---

[1] On August 23, 2019, N.J.S.A. 39:4-50 was amended to expand the use of ignition interlock devices and reduce the duration of license forfeitures. See DRIVING UNDER INFLUENCE OF ALCOHOL OR DRUGS—IGNITION INTERLOCK DEVICES (L. 2019, c. 248).

after December 1, 2019, as well as an administrative directive[2] indicating the same. The court sentenced defendant on the DWI conviction to ninety days in jail with credit for four days previously served, and ninety days in an inpatient drug and alcohol rehabilitation program. Her license was suspended for ten years and she was subject to three years of ignition interlock. Defendant was sentenced to a consecutive ten-year license suspension and three years of ignition interlock on the refusal conviction.[3]

At the start of the sentencing hearing, defense counsel advised he had emailed the court a brief earlier that day requesting the court address his argument regarding defendant's entitlement to a jury trial. Counsel agreed there was no formal motion before the court and he had not properly raised the issue previously. Nevertheless, counsel framed his application as a "reconsideration motion" and he asked the court to stay the jail sentence because of the "substantial issue."

On March 13, 2020, the Law Division judge entertained oral argument on defendant's motion for reconsideration. Defendant argued she was entitled

---

[2] Administrative Directive #25-19, "Implementation of New DWI Law (L. 2019, c. 248) – Includes Expanded Use of Ignition Interlock Devices for First-Time Offenders" (Dec. 4, 2019).

[3] The court memorialized its findings underlying defendant's convictions and sentence in a February 18, 2020 order.

to a jury trial and if so, there was no proper waiver of it. The Law Division judge disagreed.

The judge first noted that defendant had not raised the issue of her entitlement to a jury trial either before the municipal court or on appeal. The issue was only mentioned fleetingly within defendant's argument that she received ineffective assistance of counsel for counsel's failure to request a jury trial, among other things. In his written decision, the judge had rejected defendant's ineffective assistance of counsel contention, finding it was better suited for a post-conviction relief application.

Nevertheless, the judge directly addressed the argument. He found the law was well-established that defendant was not entitled to a jury trial unless the term of imprisonment exceeded 180 days, citing to State v. Hamm, 121 N.J. 109 (1990) and State v. Denelsbeck, 225 N.J. 103, 128 (2016). Because he only imposed a ninety-day jail sentence, the judge reasoned that defendant was not deprived of her right to a jury. The court granted defendant's request to continue the stay of her jail sentence pending appeal to this court.

IV.

Defendant raises the following issues on appeal:

I. THE LAW DIVISION ERRED IN HOLDING DEFENDANT'S RIGHT TO COUNSEL OF CHOICE WAS NOT VIOLATED

II. THE LAW DIVISION ERRED IN HOLDING THAT DEFENDANT'S RIGHT TO TESTIFY WAS NOT VIOLATED

III. DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF MUNICIPAL TRIAL COUNSEL

IV. THE LAW DIVISION ERRED IN HOLDING THAT THE MUNICIPAL JUDGE WAS NOT REQUIRED TO RECUSE HIMSELF AT TRIAL

V. THE LAW DIVISION ERRED IN HOLDING THAT DEFENDANT WAS NOT ENTITLED TO A JURY TRIAL ON THE CHARGES AND A THIRD DWI AND REFUSAL CONVICTION

VI. CUMULATIVE ERROR AND FUNDAMENTAL FAIRNESS REQUIRE VACATING DEFENDANT'S CONVICTIONS AND REMANDING FOR PROPER PROCEEDINGS

VII. THE EFFECTIVE DATE OF THE RECENT DWI SENTENCING REVISION STATUTE, P.L. 2019, C.248 IS UNCONSTITUTIONAL AS APPLIED TO THIRD DWI AND REFUSAL DEFENDANTS IN VIOLATING EQUAL PROTECTION UNDER THE LAW. THE COURT ALSO HAS INHERENT AUTHORITY TO APPLY THE NEW SENTENCING PROVISIONS

13

RETROACTIVELY.  THUS,  THIS  SENTENCING
SCHEME SHOULD APPLY TO DEFENDANT

In considering defendant's convictions, our review is "limited to determining whether the Law Division's de novo findings 'could reasonably have been reached on sufficient credible evidence present in the record.'" State v. Palma, 426 N.J. Super. 510, 514 (App. Div. 2012) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).  We do "not undertake to alter concurrent findings of facts and credibility determinations made by two lower courts absent a very obvious and exceptional showing of error."  State v. Robertson, 228 N.J. 138, 148 (2017) (quoting State v. Locurto, 157 N.J. 463, 474 (1999)).

In reviewing a trial judge's conclusions in a non-jury case, substantial deference is given to the trial court's findings of fact.  Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84 (1974)).  These findings should only be disturbed when there is no doubt that they are inconsistent with the relevant, credible evidence presented below, such that a manifest denial of justice would result from their preservation.  Id. at 412.  However, this court owes no deference to the trial judge's legal conclusions.  Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995).

A.

Defendant contends her right to counsel was violated when the municipal court denied her an adjournment to obtain private counsel. A defendant's right to have the assistance of counsel derives from both the United States and the New Jersey Constitution. U.S. Const., amend. VI; N.J. Const. art. I, ¶ 10. However, the right to counsel of one's choice is not absolute; a trial court retains "wide latitude in balancing the right to counsel of choice . . . against the demands of its calendar." State v. Kates, 426 N.J. Super. 32, 45 (App. Div. 2012) (quoting United States v. Gonzalez–Lopez, 548 U.S. 140, 152 (2006)). Such balancing requires "an intensely fact-sensitive inquiry." State v. Hayes, 205 N.J. 522, 538 (2011).

To perform the analysis, our Supreme Court adopted the factors established in United States v. Burton, 584 F.2d 485, 490-91 (D.C. Cir. 1978), in its decision in Hayes, 205 N.J. at 537-39. These include:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of

15

whether the other counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; the complexity of the case; and other relevant factors which may appear in the context of any particular case.

[Id. at 538 (quoting Burton, 584 F.2d at 490-91).]

Given the fact-intensive nature of this inquiry, "a constitutional deprivation occurs only when the court mistakenly exercises its discretion and erroneously or arbitrarily denies a continuance to retain chosen counsel." Kates, 426 N.J. Super. at 47; see also Morris v. Slappy, 461 U.S. 1, 11 (1983) (citation omitted) (holding "[O]nly an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.").

Here, the Law Division judge properly applied the balancing test and discussed the Burton factors, including the legitimacy of the reasons for the delay, defendant's failure to specify the length of the requested adjournment, the six prior adjournments, and the fact that defendant had competent counsel at trial. After considering the factors, the judge concluded that defendant was not entitled to a seventh adjournment on the day of trial given the court's "need

to control its calendar and [defendant]'s inability to say how she would pay for private counsel."

The municipal court judge had inquired of defendant at the time of her first appearance five months earlier whether she intended to proceed with private counsel or to apply for a public defender. Defendant chose to be represented by a public defender, stating she was unemployed and did not have the means to retain private counsel. She was thereafter represented by a public defender during each of the seven times she appeared in court. During those appearances, defendant did not state she wished to retain private counsel. Even when she requested the seventh adjournment on the day of trial, defendant did not have an explanation for where she would procure the money to retain counsel. We also note the Law Division judge's skepticism concerning defendant's sincerity, given her behavior in court, her statement that she believed she was only facing liability for property damage, and her refusal to answer questions directly. These actions caused the judge to suspect defendant was merely seeking a further delay in the trial. We cannot disagree. Under the circumstances, it was well within the municipal court judge's discretion to deny the adjournment and commence the trial with the public defender's representation.

A-2881-19

B.

We also discern no error in the Law Division judge's determination that defendant was not deprived of her right to testify. Defendant asserts that neither the municipal court judge nor defense counsel advised her of this right, and to the contrary, the judge repeatedly told her she could not testify. These arguments lack merit.

As the Law Division judge correctly noted, a trial court judge has no duty to advise a defendant of her right to testify or to explain the consequences of such testimony when the defendant is represented by counsel. See State v. Bogus, 223 N.J. Super. 409, 426 (App. Div. 1988). In addition, the record is devoid of any evidence that counsel did not explain to defendant her right to testify or that she otherwise did not understand this right.

On March 25, 2019, when defendant asked for an adjournment, and during the discussions regarding the plea offer and whether defendant had the means to retain private counsel, she interrupted the judge on numerous occasions. The judge remained patient at all times but repeatedly asked defendant not to interrupt him. She remained persistent in preventing the judge from finishing a sentence. On several occasions, defendant insisted on discussing the facts of her case as she perceived them and told the judge she

was not guilty.  The judge responded by telling defendant she could not testify at that moment and the purpose of a trial was for him to determine her guilt.

The Law Division judge interpreted the municipal court judge's statements as protecting defendant from self-incrimination, not as preventing her from offering testimony during the trial.  We are satisfied this determination is supported by the credible evidence in the record.  The judge told defendant not to discuss the facts of the case until the appropriate time at trial.  His statement protected a cherished right – defendant's right to remain silent.

C.

We need only briefly address defendant's ineffective assistance of counsel argument.  Defendant's contentions all allege errors of counsel that require a review of evidence not contained in the trial record.  Therefore, these claims ae better suited for post-conviction review.  See State v. Preciose, 129 N.J. 451 (1992).

D.

We turn next to defendant's assertion that the Law Division erred in finding the municipal court judge was not required to recuse himself.  Defendant contends the judge should have recused himself because he: (1)

described her behavior in the courtroom regarding the last-minute adjournment request as a "wonderful act"; (2) was "angry and antagonistic" to her during the trial; (3) told defendant not to testify on multiple occasions;[4] and (4) engaged in an ex parte communication with Mr. Fazioli after hearing testimony, but before rendering a verdict.

Because defendant did not request the municipal court judge to recuse himself, the Law Division judge properly reviewed these contentions for plain error. See State v. Allen, 236 N.J. Super. 58, 62 (Law. Div. 1989) (stating issues not raised in the municipal court are waived unless they "are jurisdictional, constitutional or amount to plain error."). Defendant relies on State v. Perez, 356 N.J. Super. 527, 532-33 (App. Div. 2003), for the proposition that a judge should recuse himself after opining on a defendant's credibility, even without a request by counsel.

Rule 1:12-1 requires a judge to recuse him or herself if, among other things, the judge has "given an opinion upon a matter in question in the action[,]" or "when there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the

---

[4] This contention merits no further discussion for the reasons previously stated.

parties to believe so." The disqualification decision is initially left to the discretion of the trial court. State v. Marshall, 148 N.J. 89, 276 (1997).

After listening to defendant's request for private counsel, and her assertions that a previous public defender had told her several times that she was only liable for property damage and enduring constant interruptions, the judge asked defendant again to stop interrupting him. He then added,

> Quite frankly I think you are putting on a wonderful act. You have been in this [c]ourtroom so many times. You were advised this was a trial date. You had ample opportunity if you weren't satisfied with the public defender . . . [defendant interrupts] to get a private attorney if you so chose to do so. It's the day of trial. [Everyone] is ready. An incredibly generous plea offer was provided to you. Incredibly generous. You have chosen to turn it down. So now we are going to have a trial.

Although the judge's comments reflected his frustration with defendant's constant interruption of him and the proceedings, and what he perceived as a last-minute delay tactic, there was no basis for a recusal. As the Law Division correctly noted, the judge was permitted to make this statement, as it was issued in the context of his reasoning for denying her adjournment.

Furthermore, defendant's reliance on Perez is mislaid. There, we found recusal was warranted because the judge expressed bias towards the minority group to which defendant belonged, circumstances not present here. Perez,

21

356 N.J. Super. at 532-33. For the same reasons, we reject defendant's assertions that the judge was angry and antagonistic. The judge remained professional and patient in his interactions with a difficult litigant. We discern nothing in his demeanor that warrants recusal on that basis.

As stated, after the presentation of evidence was closed, the court adjourned for a week. When the parties returned, the judge heard closing arguments and then issued his findings and determination of guilt on the charges. After the imposition of sentence, defendant told the court she had not done anything wrong and she needed more time because she did not have a lawyer.

At that point, the judge advised defendant he had spoken to Mr. Fazioli who denied making any representation to defendant that she was only facing charges regarding property damage. The judge's conversation with Mr. Fazioli during the pendency of this matter was an inappropriate ex parte communication. See Goldfarb v. Solimine, 460 N.J. Super. 22, 31 (App. Div. 2019) (citation omitted) (holding a "judge may not initiate or consider ex parte communications concerning a pending or impending proceeding"); Code of Judicial Conduct R. 3.8.

Although this was an improper communication, we are satisfied the isolated conversation did not affect the outcome of the case. The information obtained in the brief conversation only pertained to a discrete issue: whether defendant was misinformed regarding the possible consequences of a guilty finding on her charges, requiring an adjournment. The information obtained from the conversation did not pertain to the merits of defendant's case. It only concerned the decision to deny an adjournment. For the reasons previously stated, it was within the municipal judge's discretion to deny the adjournment request.

Defendant has not demonstrated that the improper communication "tainted the proceedings with the appearance of partiality." Goldfarb, 460 N.J. Super. at 33. A party seeking recusal must demonstrate an objectively reasonable belief that the proceedings were unfair. Panitch v. Panitch, 339 N.J. Super. 63, 67 (App. Div. 2001). Here, defendant has not shown impartiality or bias. There was overwhelming evidence supporting defendant's guilt of the respective charges. Furthermore, any taint resulting from this ex parte communication was removed when the Law Division reviewed de novo and affirmed defendant's convictions and sentence. See Goldfarb, 460 N.J.

23

Super. at 36 (stating "an appellate court's de novo review would suffice to cure any taint at the trial level").

E.

We turn to a consideration of defendant's argument that the Law Division erred in denying her motion for reconsideration and finding she was not entitled to a jury trial. Although defendant was not sentenced to more than 180 days in jail, she asserts that the entirety of her sentence entitled her to a jury trial.

Like the Law Division, we recognize that defendant did not raise this issue before the municipal court or in the de novo appeal other than subsuming it as one of her contentions within her ineffective assistance of counsel argument. However, since the Law Division considered the argument, we will do so also for completeness.

Defendant did not request a jury trial despite six appearances before the municipal court. Before this court, defendant argues she was deprived of her constitutional right to a jury trial because she was not offered a trial by jury nor did she waive the right.

In Blanton v. City of N. Las Vegas, 489 U.S. 538 (1989), the Supreme Court reaffirmed a previous holding that a defendant was only entitled to a

jury trial if the offense for which he was charged carried a maximum authorized prison term of greater than six months. Id. at 542 (citing Baldwin v. New York, 399 U.S. 66, 69 (1970)). The Court further stated that

> A defendant is entitled to a jury trial in such circumstances only if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a "serious" one.
>
> [Id. at 543.]

Our courts have long affirmed the well-established precedent. See State v. Stanton, 176 N.J. 75, 88 (2003) (stating that "there is no right to trial by jury of DWI or other Title 39 offenses because they are not deemed to be serious enough."); see also State v. Graff, 121 N.J. 131, 135 (1990) (holding that a defendant does not have the right to a jury on a DWI charge).

In Hamm, the Court considered whether the potential penalties for a third DWI conviction, such as presented here, rose to the required level of an onerous penalty to require a jury trial. 121 N.J. at 111. At the time, a third or subsequent DWI offender was exposed to a prison term of 180 days that could be served by completing a ninety-day community service sentence and a combination of in- and out-patient treatment. The offender also faced a ten-

25

year driver's license suspension and a $1000 fine, annual surcharges and other fines. After pleading guilty, the defendant was sentenced to ninety days of community service, twenty-eight days in an inpatient program, sixty days in an outpatient program, fines and insurance surcharges, and a license suspension of ten years.

Guided by Blanton, the Court framed the issue before it as "whether the Legislature has so 'packed' the offense of DWI that it must be regarded as 'serious' for [S]ixth-[A]mendment purposes." Id. at 114-15. Although the Court acknowledged New Jersey's DWI laws were described as some of the "toughest in the nation,"[5] the Court concluded that "New Jersey's history and traditions with respect to DWI offenses convince us that however deliberately our Legislature has addressed the problem, it has yet to take that step that would transform a DWI offense into a constitutionally serious offense." Id. at 115.

The Court noted that the $1000 fine was considered "petty" under Blanton and, other than the 180-day imprisonment term, the remaining third offense DWI penalties were civil penalties, including the suspension or cancellation of a license. Id. at 117. Moreover, a DWI offense was not

_____

[5] Kelly v. Gwinnell, 96 N.J. 538, 545 (1984) (citing Governor's Annual Message to the N.J. State Legislature, Jan. 10, 1984).

regarded as a criminal offense under the New Jersey Code of Criminal Justice. Id. at 118. See State v. Hammond, 118 N.J. 306 (1990) (holding that DWI is not a criminal offense under the Code of Criminal Justice).

In specifically considering the license suspension, the Court stated that "although in itself a heavy burden, [the penalty] is both precautionary and penal. No other loss of privilege, franchise, or right of citizenship flows from a DWI conviction." Id. at 129. In conclusion, the Court found no violation of the Blanton benchmarks. Id. at 130.

Recently, the Court reexamined its holding in Hamm to determine whether the increased penalties now imposed on a third-DWI offender converted the DWI offense to a "serious" crime entitling the offender to a jury trial. In Denelsbeck, 225 N.J. at 108, the defendant was found guilty of his fourth DWI offense. He was sentenced to the mandatory term of 180 days' incarceration, ten years of driver's license suspension, two years of an ignition interlock device, twelve hours at the Intoxicated Driver Resource Center and various fines and surcharges. Ibid.

The defendant argued, as here, that because the Legislature had increased the severity of the penalties for third or subsequent DWI offenses since the Court's opinion in Hamm, he was entitled to a jury trial. He asserted

that the "'packing' by the Legislature of numerous financial penalties, the ten-year driving privilege suspension, the ignition interlock device requirement, and the mandatory 180 days' confinement demonstrate that it now views third or subsequent DWI offenses as 'serious' for purposes of the Sixth Amendment." Id. at 109.

The Denelsbeck Court noted that although the law had changed regarding noncustodial alternatives, the mandatory sentence of 180 days remained the same. Id. at 116. However, the Legislature had added an additional restriction, requiring a third or subsequent DWI offender to install an ignition interlock device after the end of the period of license suspension. Id. at 117. The sentencing court had the discretion to order the device to remain in place between one and three years. Ibid.

Because the defendant was not exposed to a term of imprisonment greater than 180 days, the Court continued to categorize the DWI offense as "petty." Id. at 122. However, because the sentencing scheme now included the installation of an ignition interlock device, the Court considered whether the addition created the "rare situation where a legislature packs an offense it deems 'serious' with onerous penalties that nonetheless 'do not puncture the [six]-month incarceration line.'" Ibid. (quoting Blanton, 489 U.S. at 544).

The Court found it did not, stating:

> even when the ignition interlock device is installed, the burden is not so onerous as to indicate that the Legislature views repeat DWI offenses as 'serious.' Specifically, the ignition interlock device merely limits the vehicles an offender can operate, and prevents the offender from driving with a certain BAC level. Thus, while perhaps an inconvenience, the requirement, like the license suspension, is preventative rather than punitive.
>
> [Id. at 123.]

Although the Court found the defendant was not entitled to a jury trial, it warned the Legislature it had "reached the outer limit in subjecting third and subsequent DWI offenders to confinement without a jury trial." Id. at 126. Similarly, the Court cautioned the State that it "had also reached the outer limit of additional penalties that may be added for a third or subsequent DWI offense without triggering the right to a jury trial." Ibid. However, until the period of mandatory incarceration changed or additional penalties were imposed, the Court found "the penal consequences of the offense do not tip the balance to classify it as 'serious.'" Ibid.

The penalties defendant faced here for her third DWI offense were no different than those considered in Denelsbeck. The maximum period of incarceration remains 180 days. In addition, defendant was sentenced to less

jail time than Denelsbeck, as the Law Division judge only imposed a sentence of ninety days' incarceration and ninety days in an inpatient drug and alcohol rehabilitation program. Because the "most relevant information" in determining whether a defendant is entitled to a jury trial is the length of the maximum authorized jail sentence, the tenets of Blanton and Hamm and Denelsbeck have not been violated. Id. at 112 (citation omitted).

Acknowledging the maximum statutory period of confinement was unchanged from that reviewed in prior cases, defendant relies on the Court's declaration in Denelsbeck that increased penalties might trigger the right to a jury trial. Because of her refusal to submit to an Alcotest, defendant was convicted of the refusal charge and sentenced to additional penalties, including a ten-year license suspension as a third time refusal offender, consecutive to the ten years' suspension imposed under the DWI conviction. She asserts this distinguishes her situation from Hamm and exceeds the outer limit for DWI penalties as articulated in Denelsbeck. We disagree.

The refusal charge is a separate offense from a DWI. A person charged with DWI is only also charged with refusal to take a chemical test if in fact the motor vehicle driver takes that action – refuses a request to submit to an Alcotest. Just like other motor vehicle charges that might arise out of a DWI

30

event, such as leaving the scene of an accident or reckless driving, the refusal charge carries its own penalties.

The Hamm Court and the majority in Denelsbeck did not consider the right to a jury trial in the context of all of the penalties an intoxicated driver might be exposed to in addition to DWI sanctions. The Court addressed first the threshold requirement of 180 days' jail time and noted if the Legislature added any further penalties and sanctions to a DWI offense, a future Court might find the penal consequences at that point had tipped the scales, triggering the Sixth Amendment right to a jury trial.

The additional penalties defendant faced here arose from her refusal conviction – a sanction statutorily required to run consecutively because this was defendant's third refusal offense. The Legislature did not add additional sanctions for a DWI conviction. Therefore, defendant was not entitled to a jury trial.

F.

In challenging her sentence, defendant contends that the Law Division judge erred by not sentencing her under the amended DWI law. Again, we disagree.

On August 23, 2019, the Legislature amended N.J.S.A. 39:4-50 to expand the use of ignition interlock devices and reduce the duration of license forfeitures. Applicable to defendant, under the amendment, the period of license forfeiture for third DWI offenders was reduced from ten years to eight years.

However, the law did not become effective until December 1, 2019 so that "[t]he Chief Administrator of the New Jersey Motor Vehicle Commission m[ight] take any anticipatory administrative action in advance of that date as shall be necessary to implement the provisions of this act." L. 2019, c. 248. In addition, the statute indicated it was applicable only to offenses that occurred after that date.

Our Supreme Court has established "well-settled" principles governing statutory interpretation. In re Kollman, 210 N.J. 557, 568 (2012). Under these principles, a court's "primary goal when interpreting a statute is to determine and carry out the Legislature's intent." Ibid. (citing Allen v. V. & A Bros., Inc., 208 N.J. 114, 127 (2011)). This process begins with the statutory language. Ibid. This process begins with the statutory language. Kollman, 210 N.J. at 568. "[Courts] ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so

as to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citations omitted). If the plain language is clear, the court's task is complete. New Jersey Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 549 (2012) (citation omitted). Under the plain language of the statute, because the offense of which defendant was convicted occurred in September 2018, she was not entitled to the benefit of the amended law.

We are not persuaded by defendant's argument that the trial court violated her equal protection rights in not retroactively applying the amended law. Specifically, defendant contends the four-month period between the law's passage and its effective date was imposed without a rational basis.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," meaning that all persons similarly situated should be treated alike. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyer v. Doe, 457 U.S. 202, 216 (1982)). The general rule is that legislation is presumed to be valid if the statute's classification is rationally related to a legitimate state interest. Id. at 440 (citing Schweiker v. Wilson, 450 U.S. 221, 230 (1981)).

Within the New Jersey Constitution, the principle of equal protection derives from constitutional language, which states: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." N.J. Const. art. I, ¶ 1. Article I does not contain the term "equal protection." However, "it is well settled law that the expansive language of that provision" is the source for this "fundamental [state] constitutional guarantee[]." Sojourner A. v. N.J. Dep't of Human Servs., 177 N.J. 318, 332 (2003) (quoting Planned Parenthood of Cent. N.J. v. Farmer, 165 N.J. 609, 629 (2000)).

An equal protection analysis under the New Jersey Constitution slightly differs from analysis of this fundamental right under the United States Constitution. Greenberg v. Kimmelman, 99 N.J. 552, 567 (1985). In Robinson v. Cahill, 62 N.J. 473, 491-92 (1973), our Supreme Court began to develop an independent analysis of state constitutional rights under Article I, Paragraph 1, that "rejected two-tiered equal protection analysis . . . and employed a balancing test in analyzing claims under the state constitution." Greenberg, 99 N.J. at 567 (quoting Taxpayers Ass'n of Weymouth Twp. v.

34

Weymouth Twp., 80 N.J. 6, 43 (1976)).  That balancing test considers "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction."  Ibid. (citing Right to Choose v. Byrne, 91 N.J. 287, 308-09 (1982)).

In later cases, the Court at times has applied traditional federal tiers of scrutiny to an equal protection analysis, instead of a balancing test.  "Where a statute does not treat a 'suspect' or 'semi-suspect' class disparately, nor affect a fundamental right [including a liberty interest], the provision is subject to a 'rational basis' analysis."  State v. Lagares, 127 N.J. 20, 34 (citing Dandridge v. Williams, 397 U.S. 471 (1970)).  Under this analysis, the government action only must be "rationally related to the achievement of a legitimate state interest."  Ibid. (citing Byrne, 91 N.J. at 305); see also Lewis v. Harris, 188 N.J. 415, 443 (2006).

Although the terms of the balancing test and the tiered-scrutiny test differ, the Court in Sojourner v. N.J. Dep't of Human Servs., pointed out that "although our mode of analysis [under the New Jersey Constitution] differs in form from the federal tiered approach, the tests weigh the same factors and often produce the same result."  177 N.J. at 333 (citing Barone v. N.J. Dep't of Human Servs., 107 N.J. 355, 368 (1987)).

Here, the four-month period between the adoption and effective date of the new DWI law need only pass rational basis review. The revocation of an individual's driver's license no doubt constitutes a serious penalty; however, it does not rise to the level of the deprivation of a fundamental right. See Hamm, 121 N.J. at 125. Moreover, individuals such as defendant, who will have their licenses revoked for ten years rather than eight years for their third DWI offense, do not constitute a "suspect" class. See Barone, 107 N.J. at 365 (citing San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 28 (1973) (defining a suspect class as one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.")).

In amending the DWI statute, the Legislature provided the required rational basis for the four-month delay from the passage date until the December 1, 2019 effective date. The Legislature expressly stated the delay was imposed so that "[t]he Chief Administrator of the New Jersey Motor Vehicle Commission may take any anticipatory administrative action in advance of that date as shall be necessary to implement the provisions of this act." L. 2019, c. 248.

Defendant has not established the Legislature's proffered justification for the four-month delay was "wholly unrelated to the legislative objective." Acuna v. Turkish, 354 N.J. Super. 500, 512 (App. Div. 2002) (citation omitted). Therefore, defendant's equal protection argument fails.

Defendant also argues the trial court erred in not using its inherent authority to retroactively apply the amended DWI law. She contends the amendments to the existing DWI law were curative and/or ameliorative and thus justify retroactive application.

Generally, the law favors prospective, rather than retroactive, application of new legislation unless a recognized exception applies. James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014). Courts must apply a two-part test to determine whether a statute should be applied retroactively: (1) whether the Legislature intended to give the statute retroactive application; and (2) whether retroactive application "will result in either an unconstitutional interference with vested rights or a manifest injustice." Ibid. (citation omitted). Under the first prong of the James test, there are three circumstances that will justify the retroactive application of a statute: (1) where the Legislature has declared such an intent, either explicitly or implicitly; (2) where the expectations of the

parties warrant retroactive application; and (3) where the statute is curative or ameliorative. Matter of D.C., 146 N.J. 31, 51 (1996).

A curative law is one which "amends a previous law which is unclear or which does not effectuate the actual intent of the Legislature in adopting the original act." Schiavo v. John F. Kennedy Hosp., 258 N.J. Super. 380, 386, (App. Div. 1992). The purpose of a curative amendment is merely to "remedy a perceived imperfection in or misapplication of a statute." Ibid. The amendment explains or clarifies existing law and brings it into "harmony with what the Legislature originally intended." Ibid.

The term "ameliorative" "refers only to criminal laws that effect a reduction in a criminal penalty." Street v. Universal Mar., 300 N.J. Super. 578, 582, (App. Div.1997) (quoting Kendall v. Snedeker, 219 N.J. Super. 283, 286 (App. Div.1987)). Further, "[e]very statutory amendment which ameliorates or mitigates a penalty for a crime is not automatically subject to a presumption of retroactivity. The ameliorative amendment must be aimed at mitigating a legislatively perceived undue severity in the existing criminal law." Kendall, 219 N.J. Super. at 286.

Here, there is no evidence that the Legislature intended the amended DWI law to apply retroactively. To the contrary, the statute clearly provided,

"[t]his act shall take effect on the first day of the fourth month after enactment and shall apply to any offense occurring on or after that date[.]" L. 2019, c. 248. In addition, a directive from the Administrative Office of the Courts dated December 4, 2019 stated, "the new sentencing provisions apply only to defendants charged with a DWI or refusal on or after December 1, 2019."[6]

Moreover, this court has previously considered this argument and rejected it on several occasions. In State v. Chambers, 377 N.J. Super. 365 (App. Div. 2005), the State appealed the court's retroactive application of N.J.S.A. 39:4-50 which imposed a DWI sentence enacted after the date of the offense and after the municipal sentence. We reversed, finding N.J.S.A. 1:1-15 prohibited the retroactive application of a statutory amendment reducing a criminal penalty unless the amendment expressly stated it applied retroactively. We held the amended statute was not ameliorative because the defendant had incurred the penalty under the former version of the statute at the time of the municipal sentencing, prior to the amendment's effective date. Id. at 374-75. See also State v. Kostev, 396 N.J. Super. 389, 391 (App. Div. 2007) (stating that a defendant is subject to the sentencing options available at the time of their DWI offense); State v. Luthe, 383 N.J. Super. 512, 514 (App.

_____

[6] AOC directives are "unquestionably binding on all trial courts." State v. Morales, 390 N.J. Super. 470, 472 (App. Div. 2007).

39

Div. 2006) (stating that where the statutory "mandate is clear, we need not resort to extrinsic evidence to discern the Legislature's intent in enacting this amendment."). Defendant has not met the James test to apply the amended statute retroactively.

Defendant also has not demonstrated the Legislature amended the DWI law because it was unclear or failed to effectuate the legislative intent behind the law. Rather, the legislative findings at the beginning of the amendments indicate the Legislature implemented the change to expand the use of ignition interlock devices because such devices "are more effective in deterring drunk driving than license suspension." L. 2019, c. 248. Given the absence of any indication that the amendment was meant to clarify the existing DWI law, it cannot be said that the amendment was curative in nature.

Nor can the amendment be classified as ameliorative. The new law "significantly expands" the use of ignition interlock devices. While this expansion is accompanied by a lessening of the period of license forfeiture, including a reduction from ten to eight years for third DWI offenders, there is no indication that the modification came about due to a recognition on the part of the Legislature of an undue severity in the existing penalties for DWI convictions. There is no suggestion that the Legislature found the previous

license forfeiture period was unduly harsh. Rather, the amendment was intended to introduce more effective penalties. Defendant has not established any error in the trial court's decision to decline sentencing her under the amended law.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2881-19